**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DAVID AMBROSE, individually and on behalf of all others similarly situated, | |
| Plaintiff, | NO. 1:22-CV-10195-RGS |
| v. | |
| BOSTON GLOBE MEDIA PARTNERS, LLC, | |
| Defendant. | |

**DEFENDANT BOSTON GLOBE MEDIA PARTNERS, LLC'S**
**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 3

    I.   Boston Globe and its Website ................................................................................ 3

    II.  The Alleged Statutory Violation ........................................................................... 4

ARGUMENT ................................................................................................................... 6

    I.   Legal Standard ...................................................................................................... 6

    II.  The VPPA Does Not Apply to News Clips or to the Globe ................................ 7

       A. The Globe Is Not "Engaged in the Business" of Delivering Video Content ........................... 8

       B.  News Video Clips Fall Outside the Scope of the VPPA ..................................... 11

    III. Plaintiff Fails to Allege the Globe Disclosed His Identity Along with the Video News Clips He Viewed ................................................................................................ 15

    IV. Plaintiff Does not Allege a Knowing Disclosure of PII ..................................... 19

CONCLUSION ............................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................. 7, 19

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................................................. 7, 16

*Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*,
    228 F.3d 24 (1st Cir. 2000)...................................................................................... 17

*D'Agostino v. Federal Ins. Co.*,
    No. 12-11628-DJC, 2014 WL 858333 (D. Mass. Mar. 3, 2014).............................. 11

*Eichenberger v. ESPN*,
    876 F.3d 979 (9th Cir. 2017) ............................................................................. 3, 9, 19

*First Fed. Sav. & Loan Ass'n of Bos. v. State Tax Comm'n*,
    437 U.S. 255 (1978)................................................................................................. 12

*Goodman v. Main Springs*,
    No. 14-12585-FDS, 2014 WL 5454220 (D. Mass. Oct. 27, 2014)....................... 7, 16

*Gooley v. Mobil Oil Corp.*,
    851 F.2d 513 (1st Cir. 1988)...................................................................................... 7

*In re Facebook Internet Tracking Litig.*,
    263 F. Supp. 3d 836, 840 (N.D. Cal. 2017) .............................................................. 18

*In re Google Cookie Placement Consumer Privacy Litig.*,
    806 F.3d 125 (3d Cir. 2015) ..................................................................................... 18

*In re Hulu Privacy Litig.*,
    86 F. Supp. 3d 1090 (N.D. Cal. 2015) ................................................................ 15, 20

*In re Hulu Privacy Litig.*,
    No. C 11-03764 LB, 2012 WL 3282960 (N.D. Cal. 2012) ...................................... 14

*In re Nickelodeon Consumer Privacy Litig.*,
    827 F.3d. 262 (3d Cir. 2016) ................................................................................. 9, 19

*In re Vizio, Inc., Consumer Privacy Litig.*,
    238 F. Supp. 3d 1204 (C.D. Cal. 2017) ...................................................................... 8

*Lainier v. City of Boston*,
  95 F. Supp. 2d 17 (D. Mass. 2000) ....................................................... 10

*Locklear v. Dow Jones & Co., Inc.*,
  101 F. Supp. 3d 1312 (N.D. Ga. 2015) ................................................. 15

*Mollett v. Netflix, Inc.*,
  No. 5:11-CV-01629-EJD, 2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) .............................. 20

*Nat'l Network of Abortion Funds v. David*,
  No. 18-10596-GAO, 2019 WL 4740572 (D. Mass. Sept. 27, 2019) ....................................... 16

*Ocasio-Hernández v. Fortuño-Burset*,
  640 F.3d 1 (1st Cir. 2011) ............................................................. 6, 7

*Peñalbert-Rosa v. Fortuño-Burset*,
  631 F.3d 592 (1st Cir. 2011) ............................................................... 7

*Perry v. Cable News Network, Inc.*,
  854 F.3d 1336 (11th Cir. 2017) ....................................................... 9, 15

*Ross v. Blake*,
  578 U.S. 632 (2016) ...................................................................... 14

*Ruiz Rivera v. Pfizer Pharm., LLC*,
  521 F.3d 76 (1st Cir. 2008) ................................................................ 7

*Schatz v. Republican State Leadership Comm.*,
  669 F.3d 50 (1st Cir. 2012) ................................................................ 7

*Scofield v. TeleCable of Overland Park, Inc.*,
  973 F.2d 874 (10th Cir. 1992) ............................................................ 13

*Soto-Torres v. Fraticelli*,
  654 F.3d 153 (1st Cir. 2011) ........................................................ 7, 16

*Stone v. I.N.S.*,
  514 U.S. 386 (1995) ...................................................................... 14

*Travelers Indemnity Co. v. Am. Motorist Ins. Co.*,
  766 F. Supp. 804 (D.N.D. 1991) ......................................................... 10

*United States. v. Stanko*,
  491 F.3d 408 (8th Cir. 2007) ............................................................. 11

*Yershov v. Gannett Satellite Info. Network, Inc.*,
  820 F.3d 482 (1st Cir. 2016) ................................................ 15, 18, 19

*Young v. Wells Fargo Bank, N.A.,*
    717 F.3d 224 (1st Cir. 2013) .................................................................... 17

<u>Statutes</u>

18 U.S.C. § 2710 .................................................................... 2, 8, 9, 11, 15, 16

47 U.S.C. § 338 .................................................................................... 13

47 U.S.C. § 551 .................................................................................... 13

<u>Other Authorities</u>

Black's Law Dictionary (6th ed. 1990) ................................................ 11

*Cookies & Other Storage Technologies*, Facebook
    https://www.facebook.com/policy/cookies/ .................................. 6, 17

Data Protection Act of 2021, S. 2134, 117th Cong. (2021) ................ 14

*eJuror Information*, United States District Court for the District of Massachusetts,
    https://www.mad.uscourts.gov/jurors/ejuror.htm .......................... 9

H.R. Rep. No. 108-634 (2004) .............................................................. 13

H.R. Rep. No. 934, 98th Cong., 2d Sess. (1984) ................................ 13

S. Rep. No. 100–599 (1988) .......................................................... 12, 13

*Visiting the Court*, United States District Court for the District of Massachusetts,
    https://www.mad.uscourts.gov/history/court-history.htm .................. 9

## INTRODUCTION

This case is the latest in a flurry of similar lawsuits advancing a hyper-aggressive theory to contort the Video Privacy Protection Act ("VPPA")—a law designed to prevent prying into people's video rental history—into something it never was intended to be: a stealthy catch-all federal privacy law that can ensnare any unsuspecting internet site that contains any form of video content. The same law firm that filed this case seeks to stretch the scope of the VPPA to cover live sports,[1] gifs,[2] online purchases of tickets to attend public movie screenings,[3] snippets of online battles among video-game characters,[4] and, in this case, short video clips in or near news articles. The goal is as clear as it is improper: to use the ubiquity of video on the internet and the VPPA's high statutory damages to leverage hefty settlements from sites that offer any type of video, even where the videos are not available for individual purchase but are instead an incidental part of a newspaper subscription.

What makes these attempted extensions of the VPPA so inappropriate is these are not situations where new technology requires extending the reach of the VPPA beyond 1980s technology to cover advances in movie delivery, like DVDs (1997), or streaming video (2007). Such an extension to cover new ***methods*** of delivering movies like the ones Judge Bork rented in 1987, would be fair. But when Congress enacted the VPPA in 1988, it did so to address a narrow problem—the privacy of information about the selection and home viewing of movies. Congress did not include within the scope of the statute information about consumption of other types of media offerings, like books, magazines, records, newspapers, computer games, radio programming or television. Congress was

---

[1] *Louth v. NFL Enterprises LLC*, 1:21-cv-00405-MSM-PAS (D.R.I.).

[2] *Lebakken v. MH Sub I, LLC*, 1:22-cv-00644-TWT (N.D. Ga.).

[3] *Goldstein v. Fandango Media, LLC*, 9:22-cv-80569-KAM (S.D. Fla.).

[4] *Echevarria v Gamestop, Inc*., 1:22-cv-02143-ENV-JRC (E.D.N.Y.).

certainly aware of these forms of content—and excluded all of them, including news reporting—from the VPPA's scope.[5] Congress was also aware of such material when it amended the VPPA in 2013 and chose not to expand the scope of the statute's coverage.[6] The idea that consumption of news is private information if delivered by internet videoclips, but not if delivered via newsprint, radio, live TV, or email is nonsensical and inconsistent with the VPPA's text and intent. For the same reason the VPPA covers movies, whether delivered on 1980s videotapes, laserdiscs, or streaming over the Internet, it does not cover newspapers in any form, whether delivered on printed paper, video clips, or podcasts.

A plain textual reading of the VPPA supports this position. The statute applies to "video tape service providers"—those "engaged in the business" of "rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). News entities like the Globe are outside this scope for two reasons. First, the Globe is not "engaged in the business of" delivery of video content—it is in the news reporting business; its subscribers pay for access to a panoply of news reporting, delivered in newsprint and online, occasionally with video. Second, internet newsclips are not "similar audio visual materials" to the feature-length films available for rental or purchase on video tape at the time the statute was passed. Indeed, if the Globe is covered by the VPPA, any internet website with subscribers is covered if it offers video content, even where such content is not offered for purchase or sale separately. That construction of the VPPA is at

---

[5] The original text of the VPPA included library records, but that provision was removed prior to enactment. *See Video and Library Privacy Protection Act of 1988: Hearing on H.R. 4947 & S. 2361 Before the Subcomm. on Courts, Civil Liberties & the Admin. of Justice of the H. Comm. on the Judiciary & the Subcomm. on Tech. & the Law of the S. Comm. on the Judiciary*, 100th Cong. 13–15 (1988).

[6] *See* Pub. L. No. 112-258, 126 Stat. 2414 (2013). Congress was specifically encouraged to add books, music, and websites to the VPPA's scope by privacy advocates, and did not do so. *See The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century: Hearing Before the Subcomm. On Privacy, Tech. & the Law of the S. Comm. On the Judiciary*, 112th Cong. 15 (statement of William McGeveran).

odds with both its text and its intent. *See Eichenberger v. ESPN*, 876 F.3d 979, 985 (9th Cir. 2017) ("[W]e are not persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage.").

Even if the VPPA applies to the Globe's delivery of news clips (which it does not), the complaint fails for two additional reasons. ***First***, an actionable disclosure must identify both the specific video material requested ***and*** the user that requested or obtained that material. Here, the non-conclusory facts in the complaint, even if taken as true, do not plausibly allege the Globe disclosed users' identities to Facebook along with the news clips they watched. ***Second***, the complaint fails to adequately allege that any such disclosure was knowing—*i.e*, the Globe knew Facebook was using information it received to re-identify users. For these reasons, the Court should dismiss the Complaint for failure to state a claim.

## BACKGROUND

### I.     Boston Globe and its Website

The Globe is a Delaware corporation, with its principal place of business in Boston. Compl. ¶ 55. It is a 27-time Pulitzer Prize winning news source that publishes the Globe, a newspaper "featuring premium national and local content daily." *Id.* at ¶ 2.[7] The Globe distributes content through several different mediums. It offers content through the print edition of the Globe delivered to users' homes or offices. *Id.* at ¶ 47. It also offers content through its website, www.bostonglobe.com. *Id.* at ¶ 1. Users can purchase digital subscriptions to bostonglobe.com that allow them to view the news content on the site. *Id.* at ¶¶ 48, 50.

Some of the news articles on bostonglobe.com contain video content. *Id.* at ¶ 50. The Complaint does not allege what percentage of articles on bostonglobe.com contain video content (because it is very low). Nor does it allege that website visitors can subscribe to or

---

[7] *See also About the Globe*, The Boston Globe, https://www.bostonglobemedia.com/bostonglobe.

purchase video materials separate and apart from the regular content offered on the site (because they cannot). Some of the video content available on bostonglobe.com is not even created by the Globe. One example included in the Complaint is a video embedded in the article "Watch the moment David Oritz learned he was a first-ballot Hall of Famer." *Id.* at ¶¶ 18–19. As seen below, that video is a Twitter video embedded within an article, not video content the Globe created (*arrow added*):



The other article included in the Complaint does not include video in the article text. *See Id.* at ¶ 20 (referencing article titled "Devoted Health raises $1.2 billion with plans to expand across the country – the Boston Globe"). Rather, the webpage for the article includes video content on the right margin unrelated to the article.

## II.    <u>The Alleged Statutory Violation</u>

Plaintiff filed his Complaint against the Globe on February 5, 2022. Plaintiff's claim revolves around certain pixels and cookies Facebook created that interact with the bostonglobe.com website. Specifically, quoting various complicated-sounding Facebook technical documentation and pasting images of alleged computer code from unidentified

sources, Plaintiff says such pixels and cookies disclose to Facebook information identifying videos viewed by individuals. As to the videos viewed, Plaintiff alleges the Facebook Tracking Pixel on the Globe's website transfers the Uniform Resource Locator ("URL") of individual webpages on the site viewed by users to Facebook. *Id.* at ¶¶ 18–19. Plaintiff posits that if those URLs indicate the presence of a video (like the David Ortiz example the Complaint cites) it constitutes a disclosure of the video title (regardless of whether the person clicked play on the Twitter video embedded in the article). *See id.* at ¶ 18.

As to the identity of the person watching the video (or at least selecting the webpage where the video is embedded), the Complaint makes two assertions, although neither is supported by sufficiently pled facts. First, the Complaint asserts the Facebook Tracking Pixels on the Globe's website "are configured to scan form fields containing a user's email, first name, and last name" on the site's registration and login pages. *See id.* at ¶¶ 35–39. The only purported factual support for this assertion is the below image of computer code from an unidentified source pasted into the Complaint:

```
instance.optIn("884869448226452", "MicrodataJsonLd", true);
config.set("884869448226452", "automaticMatching", {"selectedMatchKeys":["em","fn","ln"]});
fbq.loadPlugin("inferredevents");
```

*See id.* at ¶ 35. The Complaint does not explain how these lines of code support the conclusion that such email, first name or last name are provided to Facebook.[8]

The other way the Complaint alleges Facebook learns the identity of visitors to bostonglobe.com is through Facebook's "c_user cookie." *See id.* at ¶ 22. The Complaint claims that "[a] visitor who is logged into Facebook while watching a video on Boston Globe will transmit the c_user cookie to Facebook" which "contains that visitor's unencrypted Facebook ID." *Id.* Notably absent, however, are facts alleging the Globe has

---

[8] There is no support for this false allegation. If the case proceeds, the record will establish that email addresses, first names, or last names are not transferred to Facebook (and indeed, that the Facebook Tracking Pixel is not on the bostonglobe.com login page). Defendants have demanded that Plaintiff either further support or retract this allegation.

involvement in that process. Instead, the Complaint relies on the conclusory claim (unsupported by any documentation) that the website "compel[s]" the user's browser to send the c_user cookie to Facebook, without explaining how it does so. *See id*. The Facebook documentation Plaintiff incorporates by reference makes clear that is not how cookies work. Specifically, it explains the c_user cookie is a cookie Facebook places on a user's web browser (i.e., Chrome or Explorer). *See id.* at ¶ 24 n.26.[9] It is not something the Globe places on the user's computer; nor does the Globe website (or any other individual website other than Facebook) have the ability to read the contents of the cookie. The transmission is between the user and Facebook—it does not go through the Globe.

Plaintiff's sole claim is for violation of the VPPA. Plaintiff seeks to bring this action on behalf of himself and "[a]ll persons in the United States who have a Facebook account, subscribed to the Globe, and viewed videos on Boston Globe's website." *Id.* at ¶ 59. Plaintiff identifies no injury he or potential class members suffered. Rather, he asks he and the class be awarded "statutory damages of $2,500 for each violation of the VPPA." *Id*. at ¶ 74.

## ARGUMENT

### I.   Legal Standard

In order to survive a motion to dismiss, a complaint must "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Court assesses the sufficiency of the plaintiff's factual allegations in a two-step process. *See Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7, 11–13 (1st Cir. 2011). First, it must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-

---

[9] *See Cookies & Other Storage Technologies*, Facebook https://www.facebook.com/policy/cookies/ ("Cookies Policy") (cited in Compl. ¶¶ 24, 27, 28) ("[c]ookies are small pieces of text used to store information on **web browsers**" and that **Facebook** "uses cookies to keep you logged in as you navigate between Facebook Pages. Cookies also help us [*i.e.*, Facebook] remember your browser so you don't have to keep logging in to Facebook and so you can more easily log in to Facebook via third-party apps and websites. For example, we use the 'c_user' and 'xs' cookies, including for this purpose, which have a lifespan of 365 days." (emphasis added).

6

action elements." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). This includes statements that "offer legal conclusions couched as facts." *Goodman v. Main Springs*, No. 14-12585-FDS, 2014 WL 5454220, at *2 (D. Mass. Oct. 27, 2014) (quoting *Soto-Torres v. Fraticelli*, 654 F.3d 153, 158 (1st Cir. 2011)). "[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross 'the line between the conclusory and the factual.'" *Peñalbert-Rosa v. Fortuño-Burset*, 631 F.3d 592, 595 (1st Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 n.5 (2007)).

Second, the court takes non-conclusory, non-speculative facts as true to see if they plausibly narrate a claim for relief. *Schatz*, 669 F.3d at 55. Plausibility requires "something more than merely possible." *Id*. Although the Court draws all reasonable inferences in the pleader's favor, it "need not accept every imaginable inference." *See id*. at 57 (citing *Gooley v. Mobil Oil Corp.*, 851 F.2d 513 (1st Cir. 1988)). Moreover, where a complaint pleads facts "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief." *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Dismissal is appropriate if the "facts" alleged do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (internal citation omitted). That is the case here. Plaintiff lards his Complaint with complex technical jargon in an attempt to create questions of fact. But when conclusory assertions are stripped away, the Complaint's factual allegations do not make out a plausible VPPA violation.

## II.     The VPPA Does Not Apply to News Clips or to the Globe

Plaintiff's claim fails first because the VPPA is about movies—it does not apply to the Globe's inclusion of news clips in the digital version of its newspaper. The VPPA limits disclosures by a "video tape service provider," which is a person "engaged in the business

. . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). Based on this definition, for the VPPA to apply, an entity must ***both*** be engaged in the business of delivering prerecorded video cassette tapes or similar audio visual materials ***and*** the materials at issue must actually be prerecorded video cassette tapes or similar audio visual materials. Because neither is the case, the Globe is not a video tape service provider, and the VPPA is inapplicable here.

### A. The Globe Is Not "Engaged in the Business" of Delivering Video Content

The Globe is not a video tape service provider because it is not "engaged in the business" of providing video content within the meaning of the VPPA. For the VPPA to apply, a defendant must make video rental, sale, or delivery a core part of its business. That is, "the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017). It must be "the focus of the defendant's work." *Id.* For this reason, "developers of many products or services that might be peripherally or passively involved in video content delivery do not fall within the statutory definition of a video tape service provider." *Id.* at 1221–22.

Plaintiff does not adequately allege the Globe is "substantially involved" in the conveyance of video materials. Plaintiff's lone allegation in this regard is the conclusory claim the Globe "created, hosted, and delivered hundreds of videos on its website." Compl. ¶ 67. But the Complaint identifies only two videos available on bostonglobe.com (not hundreds), one of which appears to be an embedded video that would not have been created, hosted, or delivered by the Globe (as opposed to Twitter). *See id.* at ¶¶ 18–20.

Even if that were not the case, the mere inclusion of some amount of video content on its website does not put the Globe "in the business of" providing video content. The Globe is in the business of selling subscriptions that fund its journalism and provide access to news

articles—delivered both digitally and in newsprint. That a small fraction of the articles on bostonglobe.com are accompanied by a video, often embedded from another website, does not change the nature of the Globe's business. By contrast, consumers joined video stores (and now sign up for Hulu or Netflix) to rent or buy videos. Plaintiff does not allege the Globe offers separate video subscriptions or pricing on its website, or that users register with the Globe specifically to receive video content.[10] The relatively scarce video content intermittently present on its website does not transform the Globe from a print news organization into a business "significantly tailored" to providing video content.

To find the VPPA extends to websites like bostonglobe.com that include videos incidentally to their primary offerings would sweep innumerable websites into the statute's reach: tool company websites containing how-to videos for the products they sell, hotel websites with videos showcasing the views and amenities they offer, apartment websites offering virtual tours, and travel organizations showing videos of travel destinations. Indeed, even this court's website would be covered, as it allows visitors to stream hearings, watch the Chief Judge's address to jurors,[11] or even take a video tour of the Moakley Courthouse.[12] These are not the videos Congress intended to protect when it enacted the VPPA. *See In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d. 262, 288 (3d Cir. 2016) (noting the VPPA "serves different purposes and protects different constituencies, than other, broader privacy laws"); *see also Eichenberger*, 876 F.3d at 985 ("[W]e are not persuaded that the 1988

---

[10] For this reason, Plaintiff is also not a "subscriber" of a video tape service provider, and therefore not a "consumer" under the VPPA. *See* 18 U.S.C. § 2710(a)(1). He is a "subscriber" to the newspaper. The fact that this subscription allows him to view video content on the Globe's website does not make him a subscriber of a video tape service provider. *See Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1342 (11th Cir. 2017) (rejecting notion that cable subscription that allowed plaintiff to access certain features on the CNN App that a typical CNN App user could not rendered him a subscriber to that app).

[11] *See eJuror Information*, United States District Court for the District of Massachusetts, https://www.mad.uscourts.gov/jurors/ejuror.htm.

[12] *See Visiting the Court*, United States District Court for the District of Massachusetts, https://www.mad.uscourts.gov/history/court-history.htm.

Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage."). Yet, this is how Plaintiff would read the law—to cover any internet site that offers video content. The Court should reject such a reading.

Cases interpreting other statues containing an "engaged in the business of" requirement are instructive. For example, *Lainier v. City of Boston* involved a Massachusetts statute prohibiting any person from "engag[ing] in the business of reselling any ticket" to shows, sporting events, and other public exhibitions without a license. 95 F. Supp. 2d 17, 18 (D. Mass. 2000). Plaintiff was arrested outside of Fenway Park when he tried to re-sell a ticket to a Red Sox game at face value after a friend cancelled at the last minute. *Id*. He sought a preliminary injunction on behalf of himself and others who were "*not* engaged in the *business* of reselling tickets and who [sought] to sell tickets outside Fenway Park at or below face value." *Id*. (emphasis in original). The court concluded plaintiffs were not "in the business" of reselling tickets, stating: "If *any* sale of tickets ran afoul of the line drawn by § 185A, [then] such an inquiry would be superfluous. Similarly, the statute would not need to proscribe sales by those 'in the business,' the legislature could simply have restricted *any* resale without a license." *Id*. at 19 (emphasis in original).

Similarly, in *Travelers Indemnity Co. v. American Motorist Ins. Co*., the court was asked to determine whether a car rental company was "engaged in the business of selling, repairing, servicing, storing, leasing or parking motor vehicles." 766 F. Supp. 804, 806 (D.N.D. 1991). Although the court recognized the company did repair, service, store, and park its rental fleet cars, it concluded it was nonetheless not "engaged in the business" of doing those things because its "performance of these activities is only incidental to its business of renting cars, and the activities per se do not produce income." *Id.* So too here. The mere fact that the online version of the Globe's newspaper includes some video content does not render the Globe "engaged in the business" of delivering video content. *See also D'Agostino v. Federal Ins. Co.*, No. 12-11628-DJC, 2014 WL 858333 (D. Mass. Mar. 3,

10

2014) (finding entity's "delivery of an insurance certificate and role in the collection . . . of premiums" insufficient to establish it was in the "business of insurance").

### B. News Video Clips Fall Outside the Scope of the VPPA

Even if the Globe was "in the business" of providing video content, it is not a video tape service provider here because the news articles at issue are not "prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). It is beyond dispute the Globe does not offer "prerecorded video cassette tapes" like the ones Judge Bork rented from his local video store. Plaintiff does not meaningfully allege as much, nor could he.

The news clips available on bostonglobe.com are also not "similar audio visual materials" to the prerecorded video cassette tapes Judge Bork rented. "Similar" is defined as "[n]early corresponding; resembling in many respects; somewhat like; having a general likeness." *Similar*, Black's Law Dictionary (6th ed. 1990);[13] *see also United States. v. Stanko*, 491 F.3d 408, 414 (8th Cir. 2007) (defining the word "similar" as "comparable" or "nearly corresponding"). At the time of the VPPA's enactment, while news in audio visual form was a cultural mainstay, it was not conveyed via "prerecorded video cassette tapes." It was consumed via network or cable television stations. News clips are thus not "nearly corresponding," "resembling in many respects" or "comparable" to prerecorded videotapes.

Had Congress wanted the VPPA to apply to *any* video it could have done so. In *Stanko*, the court observed that where "Congress used the comparative term 'similar' to modify 'offenses,' rather than saying 'any other offenses' or simply 'other offenses,'" it indicated "an intent to limit the business practices clause's reach to offenses which are 'comparable' or 'nearly corresponding' to the enumerated offenses." *Stanko*, 491 F.3d at 414. So too with the VPPA. Congress could have defined a video tape service provider as

---

[13] The "most relevant time for determining a statutory term's meaning" is the time when the law was enacted. *MCI Telecomm. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218 (1994); *see also Perrin v. United States*, 444 U.S. 37, 42–45 (1979).

someone in the business of delivering prerecorded video cassette tapes or "any other audio-visual materials" or simply "other audio-visual materials." It did not, because it did not intend the VPPA to apply to all audio-visual materials, only those like the videos rented by Judge Bork. *See also First Fed. Sav. & Loan Ass'n of Bos. v. State Tax Comm'n*, 437 U.S. 255, 262 (1978) ("When Congress required that federal savings and loan associations be placed in the same classification as 'similar' state institutions, it certainly did not assume that every local and mutual or cooperative thrift and home-financing institution is similar to a federal association.").

The VPPA's legislative history confirms that Congress did not intend to regulate news clips via the VPPA. In the Senate Report recommending the VPPA's passage, the Committee on the Judiciary identified "laser discs, open-reel movies, and CDI technologies" as "similar audio visual materials" to prerecorded video cassette tapes. *See* S. Rep. No. 100–599, at 12 (1988). This makes sense because those mediums were also used to distribute movies. By contrast, news clips were not delivered via those technologies either when the VPPA was passed or today. Similarly, when introducing the first iteration of the bill that would eventually become the VPPA, sponsoring Representative Al McCandless stated:

> There's a gut feeling that people ought to be able to read books and watch films without the whole world knowing. Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye.

*Id.* at 7. Senator McAndless did not raise a concern about knowing what sections of the local newspaper someone was reading, and the provision covering library books was removed from the law before passage.

The fact that the VPPA was intended to be a limited statute, not covering all video content is reinforced by the fact that when the VPPA was passed, there was already a statute governing the primary means by which people consumed video news—live television. In

1984, Congress enacted the Cable Act, 47 U.S.C. § 551, "to establish national policy and guidelines for the cable television industry." *Scofield v. TeleCable of Overland Park, Inc.*, 973 F.2d 874, 878 (10th Cir. 1992). The Act responded to "Congress' observation that: '[c]able systems ha[d] . . . an enormous capacity to collect and store personally identifiable information about each cable subscriber." *Id.* at 876 (quoting H.R. Rep. No. 934, 98th Cong., 2d Sess. 29 (1984)). The Act thus required that a provider "not disclose personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber." 47 U.S.C. § 551(c). Unlike the VPPA, it does not have a special provision requiring that consent be separate and distinct from other policies. *Id.* There is no evidence that in enacting the VPPA, Congress intended to supplant the Cable Act's coverage. In fact, the evidence is the opposite—that Congress recognized the existence of the Cable Act and was trying to address a narrower and yet-unaddressed problem via the VPPA. *See* S. Rep. 100-599 at 2–3 (noting the VPPA "follows a long line of statutes passed by the Congress to extend privacy protection to records that contain information about individuals," including the Cable Act, which "prohibits a cable service from disclosing information about a subscriber's cable viewing habits without the individual's consent").

The VPPA's intended narrow scope is further confirmed by passage of the Satellite Home Viewer Extension and Reauthorization Act, 47 U.S.C. § 338 ("SHVERA") in 2004. SHVERA "obligate[d] satellite operators to abide by the same privacy obligations" the Cable Act imposed on cable providers. H.R. Rep. No. 108-634, at 19 (2004). But there would have been no need for such a provision if disclosure of satellite TV viewing was already prohibited by the VPPA. Had Congress believed the VPPA reached satellite providers who delivered television news programming, the privacy provisions of the legislation would have been superfluous. *See* 47 U.S.C. § 338(i). But this interpretation makes no sense, "[w]hen Congress amends legislation, courts must 'presume it intends the change to have real and substantial effect.'" *Ross v. Blake*, 578 U.S. 632, 641–42 (2016)

13

(quoting *Stone v. I.N.S.*, 514 U.S. 386, 397 (1995)). In amending SHVERA to add these privacy protections, Congress demonstrated its understanding that such protections did not already exist—which would not have been the case if the VPPA swept as broadly as Plaintiff would read it. Simply put, the Cable Act was designed to cover one form of video content viewing (Cable TV), the VPPA another (home movie viewing), and SHVERA, a third (Satellite TV). Thus, reading the VPPA to cover the same ground as laws that preceded and followed it is prohibited under applicable statutory construction rules. Congress is now considering comprehensive federal privacy legislation, *see* Data Protection Act of 2021, S. 2134, 117th Cong. (2021), precisely because no such law exists today. The VPPA cannot be read to fill that role.

What Congress did intend was to write a protection against prying into people's private movie viewing that would not become obsolete with each new technological innovation. Thus, where courts have defined a video tape service provider to include entities that distribute works electronically, the works being distributed are similar to works that would have been distributed on prerecorded video cassette tapes. For example, in *In re Hulu Privacy Litigation*, No. C 11-03764 LB, 2012 WL 3282960, at *4 (N.D. Cal. 2012), Hulu argued it was not a videotape service provider because the VPPA "only regulate[d] businesses that sell or rent physical objects (i.e., 'video cassettes or other similar audio visual materials') . . . and not businesses that transmit digital content over the Internet." The court rejected this argument, finding the term "similar audio visual materials" was about the video content, not about how that content was delivered, and therefore applied to material distributed digitally. *Id.* at *5–6. But in doing so, the court made clear that the video content still needed to be akin to the type of movies viewed by Judge Bork. *See id.* at *6 ("Considering both together does not suggest—as Hulu argues—an intent to limit the VPPA to tangible materials but—as Plaintiffs argue—instead suggests Congress's intent to cover new technologies for pre-recorded video content."). Following *In re Hulu*, other courts have

14

applied the VPPA to movies delivered digitally, but never to how-to videos, video advertisements, videogames or short-form news clips.[14]

### III.    Plaintiff Fails to Allege the Globe Disclosed His Identity Along with the Video News Clips He Viewed

Even if the VPPA applied to the Globe's inclusion of newsclips on its website, Plaintiff's VPPA claim fails because he does not plausibly allege the Globe disclosed his identity to a third party. The VPPA covers the disclosure of personally identifiable information ("PII"). As defined in the statute, PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). An actionable VPPA claim thus requires "three distinct elements . . . the consumer's identity; the video material's identity; and the connection between them." *In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015) (recognizing that "[t]he point of the VPPA, after all, is not so much to ban the disclosure of user or video data; it is to ban the disclosure of information connecting a certain user to certain videos."). Plaintiff does not adequately allege the Globe disclosed users' PII—that is, their identities along with the videos they consumed.[15]

---

[14] While some prior lawsuits have involved VPPA claims against websites hosting news content (among other content), no court was asked to consider whether the news organizations offering those news clips were video tape service providers. *See Perry*, 854 F.3d 1336; *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482 (1st Cir. 2016); *Locklear v. Dow Jones & Co., Inc.*, 101 F. Supp. 3d 1312 (N.D. Ga. 2015). All such matters were resolved on other grounds, in favor of the defendants.

[15] As to the Globe's alleged disclosure of the video material's identity, Plaintiff claims certain URLs suggesting an article contains video are shared with Facebook via the Facebook Tracking Pixel. *See* Compl. ¶ 18. For purposes of this motion, the Globe is not challenging the sufficiency of Plaintiff's pleading with respect to disclosure of the video's identity. Should this case proceed, the Globe expects to contest this issue on various grounds, including that such theory of disclosure only applies where (1) the URL suggests a video is included in the article and (2) the user "requested or obtained" the video. Here, Plaintiff's allegation the Globe discloses a URL suggesting an article contains video does not disclose the user actually "requested or obtained" the video only that they "requested or obtained" a page containing video. *See* 18 U.S.C. § 2710(a)(1)(3).

Neither of Plaintiff's two theories of disclosure of consumers' identities suffice. First, Plaintiff claims "Boston Globe discloses a subscriber's email address, first name, and last name when inputted" into form fields on the site's login or registration page. *See* Compl. ¶ 39. This is exactly the type of "legal conclusion[] couched as fact[]" that the Court should disregard. *Goodman*, 2014 WL 5454220, at *2 (quoting *Soto-Torres*, 654 F.3d at 158).

The one actual fact the Complaint pleads relating to this disclosure is insufficient to sustain Plaintiff's claim. Specifically, the Complaint pastes the following image of a line of code from an unidentified source:

```
config.set("884869448226452", "automaticMatching", {"selectedMatchKeys":["em","fn","ln"]});
```

Compl. ¶ 35. The Complaint, however, makes no effort to explain how this line of code indicates the Globe is sharing consumers' email addresses and names with Facebook along with the video titles.[16] This allegation thus fails "to cross the critical line 'between possibility and plausibility'" and is therefore insufficient to sustain a claim. *Nat'l Network of Abortion Funds v. David*, No. 18-10596-GAO, 2019 WL 4740572, at *2 (D. Mass. Sept. 27, 2019) (quoting *Twombly*, 550 U.S. at 546) (noting that "[t]here is a difference between facts that are 'consistent with' the plaintiffs' claims and those allegations of fact that 'plausibly establish' the claims").[17]

---

[16] The unexplained code in paragraph 35 contrasts with the images purporting to show the alleged disclosure of the identity of the video being viewed. Those images included the actual URL from the Globe's website showing that the URL of the article is passed to Facebook. Here, paragraph 35 shows only the names of fields, not actual data and does not support an allegation that user information is sent to Facebook.

[17] The Complaint's recitation of Facebook materials explaining the capabilities and potential uses of its "Automatic Advanced Matching" do not cure the Complaint's failure to plausibly allege **the Globe** disclosed consumers' email addresses and names entered into form fields on bostonglobe.com to Facebook. Furthermore, even if true, this disclosure is alleged to happen at the time the user signs up (or logs in), **not along with any information about videos later requested**. Thus, even if this disclosure happened, it was not in connection with any video titles and does not violate the VPPA.

Plaintiff's second theory for how Facebook learns identities of visitors to the bostonglobe.com website fares no better because it does not allege a disclosure by the Globe. Plaintiff claims "[a] visitor who is logged into Facebook while watching a video on Boston Globe will transmit the c_user cookie to Facebook." Compl. ¶ 22. According to Plaintiff, this c_user cookie "contains that visitor's unencrypted Facebook ID." *Id.* But as the Facebook reference materials the Complaint cites extensively make clear, the c_user cookie is a cookie placed on a user's web browser (as opposed to a particular website) by ***Facebook*** and the information it collects is from a user's ***web browser*** (as opposed to a particular website).[18] Thus information collected from the user by Facebook via the c_user cookie is not information ***disclosed*** by the Globe.

Plaintiffs try to avoid this inconvenient fact through clever wording. The Complaint claims the Globe "compel[s] a visitor's browser to disclose the c_user cookie." Compl. ¶ 42. But nowhere does the Complaint explain how the Globe does so, or even could do so. The conclusory assertion the Globe is "compelling" a visitor's web browser is also at odds with the Facebook documentation the Complaint relies on. *See* Cookies Policy, *supra* note 9. As such, it should be disregarded. *See Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 229 n.1 (1st Cir. 2013) (*quoting Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.").[19]

Cases analyzing similar claims make clear communications like the one from the c_user cookie are communications between a user and Facebook. In *In re Facebook Internet*

---

[18] *See* Cookies Policy, *supra* n.9 ("we [Facebook] use the 'c_user' and 'xs' cookies.")

[19] Plaintiff makes similar allegations about other cookies Facebook places on browsers of visitors that don't have a Facebook account at all (the "fr" and "_fb" cookies). *See* Compl. ¶¶ 23–25. These allegations do not plausibly allege a disclosure by the Globe. Plaintiff's allegations regarding these cookies suffer from the additional flaw that they allow Facebook to collect only encrypted Facebook IDs and browser identifiers which would not identify a specific person even if they were being disclosed by the Globe.

*Tracking Litigation*, plaintiffs alleged Facebook violated the Wiretap Act by intercepting

URLs of websites users visited via "a small code snippet that Facebook provides" that

"causes the user's browser to send" the URL and "contents of 'cookies'—small text files—

that Facebook has stored on that user's browser" to Facebook. 263 F. Supp. 3d 836, 840

(N.D. Cal. 2017). The court dismissed plaintiffs' claim on the ground that Facebook was a

party to the relevant communication. *Id.* at 844. Specifically, the court explained:

> [A]s the page loads, the code snippet for the Facebook button triggers a second,
> independent GET request to Facebook's servers. That second request contains the
> URL of the page where the 'like' button is embedded, as well as the contents of the
> cookies that Facebook has previously set on that user's computer . . . . The parties to
> [that] second transaction are that same web user and a Facebook server—but *not*
> cnn.com [the website the court was using as an example]. As to the second
> transaction, Facebook has not 'intercepted' the communication within the meaning
> of the Wiretap Act because it is a 'party to the communication.'"

*Id.* (emphasis in original).

That reasoning applies equally here. Because Facebook is a party to the

communication involving the c_user cookie (along with the Facebook user visiting

bostonglobe.com), the Globe is not "disclosing" anything to Facebook. *See also In re*

*Google Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 142 (3d Cir. 2015)

("[O]ur understanding of the plaintiffs' allegations is that the defendants acquired the

plaintiffs' internet history information when, in the course of requesting webpage

advertising content at the direction of the visited website, the plaintiffs' browsers sent that

information directly to the defendants' server.").

In that regard, this case is unlike *Yershov*, in which the plaintiff adequately alleged

that Gannett itself disclosed the title of the video viewed on the USA Today app along with

the iPhone user's GPS coordinates and the device identifier for the user's iPhone. 820 F.3d

at 486.  Gannett argued this information was not PII because it did not identify the user.

After noting that the statutory definition of PII was "awkward and unclear," the U.S. Court

of Appeals for the First Circuit affirmed the lower court's judgment that the plaintiff had

adequately alleged that Gannett disclosed PII, as the information Gannett disclosed "was reasonably and foreseeably likely" to identify a specific person as having obtained a specific USA Today video. *Id.* Here, by contrast, once the conclusory and unsupported allegations regarding form fills are removed, the only thing the Complaint alleges the *Globe* discloses is the title of the video viewed.[20]

## IV.    Plaintiff Does not Allege a Knowing Disclosure of PII

Even if Plaintiff adequately alleged the disclosure of PII, the VPPA prohibits only "knowing" disclosures of PII. 18 U.S.C. § 2710(b)(1). Plaintiff makes the conclusory allegation that the Globe "knowingly disclos[ed] its subscribers PII" to Facebook. Compl. ¶ 3. Plaintiff repeats that conclusory assertion throughout the Complaint.[21]  But repetition is no substitute for adequate pleading. *See Iqbal,* 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do") (internal quotation marks and citation omitted). To render his allegation plausible, Plaintiff must plead actual facts in that allow the Court to infer Plaintiff has a basis for his conclusion. He does not do so.

The closest to an actual fact regarding the Globe's alleged knowledge in the Complaint is the assertion that "Boston Globe knowingly disclosed PII because it used that data to build audiences on Facebook and retarget them for advertising campaigns." Compl. ¶ 71. But once again, Plaintiff fails to provide the linkage between his legal conclusion "Boston Globe knowingly disclosed PII" and the factual allegation that "it used that data to

---

[20] Other circuits disagree with *Yershov* and hold that PII should be limited to "the kind of information that would readily permit an ordinary person to identify a specific individual's video watching behavior." *In re Nickelodeon Consumer Privacy Litig*., 827 F.3d at 290 (noting that "[t]he allegation that Google will assemble otherwise anonymous pieces of data to unmask the identity of individual children is, at least with respect to the kind of identifiers at issue here, simply too hypothetical to support liability under the Video Privacy Protection Act."); *see also Eichenberger*, 876 F.3d at 985  (noting PII "must have the same meaning without regard to its recipient's capabilities").

[21] *See* Compl. ¶¶ 5, 41, 42.

build audiences on Facebook." The Complaint cites a litany of Facebook materials, none of which suggest the Globe knew Facebook was matching the titles of videos viewed (allegedly disclosed via the Facebook Tracking Pixel) with the Facebook IDs of Facebook users visiting bostonglobe.com (collected by Facebook via the c_user cookie).

This additional failure is separately fatal to Plaintiff's VPPA claim. As the court in *In re Hulu* explained, "the term 'knowingly' connotes actual knowledge. It is not enough . . . that disclosure be merely 'voluntary' in the minimal sense of the defendant's being 'aware of what he or she is doing . . . and not act[ing] because of some mistake or accident." 86 F. Supp. 3d at 1095. Rather, "'knowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code." *Id.* Although *In re Hulu* was decided at summary judgment, here Plaintiff does not allege what is required to establish a VPPA claim: "that [Boston Globe] knew that Facebook might combine a Facebook user's identity (contained in the c_user cookie) with the watch page address [i.e., the URL] to yield 'personally identifiable information' under the VPPA." *See id.* at 1097. Plaintiff's claim should be dismissed for the additional reason that it fails to plead a "knowing" disclosure of PII. *See Mollett v. Netflix, Inc.*, No. 5:11-CV-01629-EJD, 2012 WL 3731542, at *4 (N.D. Cal. Aug. 17, 2012) ("Plaintiffs must still allege facts giving rise to a reasonable inference that Netflix knowingly or willfully disclosed PII to someone other than the consumer.").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed for failure to state a claim.

Dated: April 29, 2022 Respectfully submitted,


  /s/ James Orenstein
  James Orenstein (BBO# 550749)
  ZWILLGEN PLLC
  183 Madison Avenue, Suite 1504
  New York, NY 10016
  Telephone: (646) 362-5590
  orenstein@zwillgen.com

  Marc J. Zwillinger (*pro hac vice* pending)
  Jeff Landis (*pro hac vice* pending)
  ZWILLGEN PLLC
  1900 M. Street, Suite 250
  Washington, DC 20036

  *Attorneys for Defendant*
  *Boston Globe Media Partners, LLC*

## CERTIFICATE OF COMPLIANCE

I hereby certify that in accordance with Local Rule 7.1(a)(2), counsel for Defendant and counsel for Plaintiff have conferred in good faith regarding the resolution of this motion. Counsel for Plaintiff has indicated that Plaintiff does not assent to this motion.


   /s/ James Orenstein
James Orenstein


## CERTIFICATE OF SERVICE

I, James Orenstein, hereby certify that on this 29th day of April 2022, this document was electronically filed with the Clerk of the Court using the CM/ECF system, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), pursuant to Local Rule 5.4(C).


   /s/ James Orenstein
James Orenstein