**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| DAVID AMBROSE, individually and on behalf of all others similarly situated,<br><br>                        Plaintiff,<br><br>   v.<br><br>BOSTON GLOBE MEDIA PARTNERS, LLC,<br><br>                      Defendant. | Case No. 1:22-cv-10195-RGS |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S**
**<u>MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD......................................................................................................... 2

ARGUMENT ...................................................................................................................... 3

   I.      DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER ....................................... 3

       A.  Defendant's Video Clips Constitute Audio Visual Material ................................. 3

       B.  Defendant is Engaged in the Business of Delivering the Video Clips .................. 9

  II.     DEFENDANT DISCLOSED PLAINTIFF'S PERSONALLY IDENTIFIABLE
        INFORMATION TO FACEBOOK ........................................................................... 12

 III.    DEFENDANT DISCLOSED PLAINTIFF'S PERSONALLY IDENTIFIABLE
        INFORMATION KNOWINGLY ............................................................................. 17

CONCLUSION.................................................................................................................. 19

## **TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES**

*Decotiis v. Whittemore*,
   635 F.3d 22 (1st Cir. 2011) .................................................................................... 2

*Easlin v. The Coca-Cola Co.*,
   136 F. Supp. 3d 654 (E.D. Pa. 2015) ................................................................... 17

*Eichenberger v. ESPN, Inc.*,
   876 F.3d 979 (9th Cir. 2017) ............................................................................... 13

*Ellis v. Cartoon Network, Inc.*,
   2014 WL 5023535 (N.D. Ga. Oct. 8, 2014) ........................................................ 13

*Garcia-Catalan v. United States*,
   734 F.3d 100 (1st Cir. 2013) .................................................................................. 2

*Grajales v. Puerto Rico Ports Authority*,
   682 F.3d 40 (1st Cir. 2012) .................................................................................... 3

*Hidalgo-Semlek v. Hansa Medical, Inc.*,
   498 F. Supp. 3d 236 (D.N.H. 2020) ..................................................................... 13

*In re Facebook, Inc. Internet Tracking Litigation*,
   956 F.3d 589 (9th Cir. 2020) ......................................................................... 16, 19

*In re Facebook, Inc., Consumer Privacy User Profile Litigation*,
   402 F. Supp. 3d 767 (N.D. Cal. 2019) ...................................................... 4, 10, 15

*In re Google Inc. Cookie Placement Consumer Privacy Litigation*,
   806 F.3d 125 (3d Cir. 2015) ......................................................................... 15, 16

*In re Hulu Priv. Litig.*,
   2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ............................................. 4, 6, 17

*In re Hulu Priv. Litig.*,
   2013 WL 6773794 (N.D. Cal. Dec. 20, 2013) ...................................................... 17

*In re Hulu*,
   86 F. Supp. 3d 1090 (N.D. Cal. 2015) ...................................................... 15, 17, 18

*In re Hulu Priv. Litig* ,
   2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ...................................................... 15

*In re Nickelodeon Cons. Priv. Litig.*,
  827 F.3d 262 (3rd Cir. 2016) ................................................................ 15

*In re Nickelodeon Consumer Priv. Litig.*,
  2014 WL 3012873 (D.N.J. July 2, 2014) .............................................. 13

*In re Pharmatrak, Inc.*,
  329 F.3d 9 (1st Cir. 2003) ...................................................................... 16

*In re Vizio, Inc., Consumer Privacy Litigation*,
  238 F. Supp. 3d 1204 (C.D. Cal. 2017) ......................................... *passim*

*Jennings v. Rodriguez*,
  138 S.Ct. 830 (2018) ................................................................................ 7

*Lainer v. City of Boston*,
  95 F. Supp. 2d 17 (D. Mass. 2000) ....................................................... 12

*McCorhan v. Sandulli Grace, P.C.*,
  369 F. Supp. 3d 324 (D. Mass. 2019) ................................................... 19

*Perry v. Cable News Network, Inc.*,
  2016 WL 4373708 (N.D. Ga. Apr. 20, 2016) ...................................... 15

*Police Dept. of City of Chicago v. Mosley*,
  408 U.S. 92 (1975) ................................................................................... 8

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015) ................................................................................. 8

*Robinson v. Disney Online*,
  152 F. Supp. 3d 176 (S.D.N.Y. 2016) ............................................ 13, 15

*Senne v. Village of Paletine, Ill.*,
  695 F. 3d 597 (7th Cir. 2012) ............................................................... 17

*Shurtleff v. United States Environmental Protection Agency*,
  991 F. Supp. 1 (D.C.D.C. 2013) .............................................. 13, 14, 16

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,
  502 U.S. 105 (1991) ............................................................................ 8, 9

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ............................................................................... 17

*Twentieth Century Music Corp. v. Aiken*,
  422 U.S. 151 (1975) ............................................................................... 17

*United States v. Hastie*,
    854 F.3d 1298 (11th Cir. 2017) ........................................................ 13

*United States v. Stanko*,
    491 F.3d 408 (8th Cir. 2007) ............................................................ 6

*United States v. Szymuskiecz*,
    622 F.3d 701 (7th Cir. 2010) .......................................................... 16

*Yershov v. Gannett Satellite Information Network, Inc.*,
    820 F.3d 482 (1st Cir. 2016) ..................................................... 1, 13


## STATUTES

18 U.S.C. § 2710 ............................................................ 1, 3, 4, 5, 7, 13

20 U.S.C. § 1687 ........................................................................... 11

29 U.S.C. § 213 ............................................................................ 11

47 U.S.C. § 551 ............................................................................. 7

Conn. Gen. Stat. Ann. § 53-450 ........................................................ 4

Del. Code. Ann. Tit. 11, § 925 ......................................................... 5

Iowa Code Ann. § 727.11 ............................................................... 5

La. Rev. Stat. Ann. § 37:1748 ......................................................... 5

Mass. Gen. Laws. Ch. 140, § 185A ................................................. 12

Mass. Gen. Laws Ann. Ch. 93, § 106 ............................................... 5

Md. Code Ann. Crim. Law § 3-907 ................................................. 5

Mich. Comp. Laws § 445.1711 ....................................................... 5

Minn. Stat. Ann. § 325I.02 ............................................................ 5

N.H. Rev. Stat Ann. § 351-A:1 ....................................................... 5

N.Y. Gen. Bus. Law § 672 ............................................................. 5

R.I. Gen. Laws Ann. § 11-18-32 ..................................................... 5

Tenn. Code Ann. § 47-18-2204 ....................................................... 5

**RULES**

Fed. R. Civ. P. 9 .................................................................................................................... 19

**OTHER AUTHORITIES**

S. Rep. 100-599 ................................................................................................... *passim*

## <u>INTRODUCTION</u>

> [A]s we continue to move ahead, we must protect time honored
> values that are so central to this society, particularly our right to
> privacy.  The advent of the computer means not only that we can
> be more efficient than ever before, but that we have the ability to
> be more intrusive than ever before.  Every day Americans are
> forced to provide to businesses and others personal information
> without having any control over where that information goes.
> Those records are a window into our loves, likes, and dislikes.

S. Rep. 100-599, at 7-8 (remarks by Senator Paul Simon).  Much has changed since 1988, but

Senator Simon's words continue to ring true.  At its most basic level, Plaintiff's complaint asks

whether we continue to "protect time honored values that are central to this society, particularly

our right to privacy."

When first enacted, the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), was

the latest in "a long line of statutes passed by the Congress to extend privacy protection to

records that contain information about individuals."  S. Rep. No. 100-599, at 2 (1988).  By

passing the VPPA, Congress sought to "preserve personal privacy with respect to the rental,

purchase or delivery of video tapes or similar audio visual materials."  *Id.* at 1.  To that end,

Congress "created a civil remedy against a 'video tape service provider' for 'knowingly

disclosing, to any person, personally identifiable information concerning any consumer of such

provider.'"  *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 485 (1st Cir.

2016) (quoting 18 U.S.C. § 2710(b)(1)).  Defendant is one such "video tape service provider."

Defendant is a "self-described 'multimedia organization that provides news,

entertainment, and commentary across multiple brands and platforms.'"  (ECF No. 22) (the

"FAC") ¶ 8 (quoting Defendant's press release).  Its website, bostonglobe.com, features

"national and local content daily," including "news articles, photographs, images, illustrations,

audio clips and video clips."  *Id.* ¶ 9.  Defendant incorporates the code for the Facebook Tracking

Pixel on its website, which is "a piece of code that advertisers, like Defendant, can integrate into their website." *Id.* ¶ 25.  "Once activated, the Facebook Tracking Pixel 'tracks the people and type of actions they take.'" *Id.* ¶ 25 (quoting Facebook's documentation).

When a visitor navigates to bostonglobe.com, Defendant "transmits five distinct events to Facebook." *Id.* ¶ 28.  The event data "permit[s] an ordinary person to identify what video an individual has watched." *Id.* ¶ 32.  Defendant sends this data to Facebook alongside the c_user cookie, which contains an "unencrypted Facebook ID." *Id.* ¶ 33.  Defendant also uses "Advanced Matching,"  which transmits to Facebook "a subscriber's email address, first name, last name, telephone number, and mailing address." *Id.* ¶ 47.  Defendant thus "knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior." *Id.* ¶¶ 52-55.  By doing so, Defendant violates the VPPA.

Defendant has no compelling defense.  *First*, Defendant is a "video tape service provider" because it gains substantial revenue by delivering video clips.  *Id.* ¶¶ 7-18.  *Second*, Defendant discloses personally identifiable information ("PII") by transmitting users' email addresses, Facebook IDs, event data, and other identifiers.  *See id.* ¶¶ 28-57.  *Third*, by using the third parties' services in the first place, Defendant discloses this PII knowingly.  *Id.* ¶ 86.

## LEGAL STANDARD

"Applying the plausibility standard is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Decotiis v. Whittemore*, 635 F.3d 22, 29 (1st Cir. 2011) (internal quotations omitted).  "First, the court must distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (internal quotations omitted).  "Second, the court must determine whether the

factual allegations are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotations omitted). "In connection with a threshold plausibility inquiry, a high degree of factual specificity is not required." *Grajales v. Puerto Rico Ports Authority*, 682 F.3d 40, 47 (1st Cir. 2012).

## ARGUMENT

## I.   DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER

The VPPA broadly defines "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

Defendant presents two arguments for why it falls outside that definition's scope. First, Defendant contends that "the news content at issue does not constitute prerecorded video cassette tapes or similar audio visual material." (ECF No. 25) (the "MTD") at 8 (internal quotations omitted). Second, Defendant asserts that "it is not 'engaged in the business' of providing video content within the meaning of the VPPA." *Id.* at 12. Both arguments miss the mark. Defendant's first argument lacks textual support, disregards the legislative intent, and raises serious constitutional concerns. Defendant's second argument fares no better; as Plaintiff's allegations make clear, Defendant substantially focuses on—and derives pecuniary benefit from—delivering video clips.

### A.   Defendant's Video Clips Constitute Audio Visual Material

Defendant contends that it cannot be a video tape service provider because "the news content at issue does not constitute 'prerecorded video cassette tapes or similar audio visual materials.'" *Id.* at 8 (quoting 18 U.S.C. § 2710(a)(4)). To support this argument, Defendant reads "similar" as creating content-based limitations, modifying "audio visual materials" to mean

only videos akin to "the same traditional content that was available at the video store," and excluding videos that differ too much from "the prerecorded video cassette tapes Judge Bork rented." *Id.* at 8-9.  That interpretation, however, contravenes the VPPA's plain meaning and the legislature's intent.

The statutory text is straight-forward.  To be a video tape service provider, an entity must rent, sell, or deliver "prerecorded video cassette tapes or similar audio visual *materials*."  18 U.S.C. § 2710(a)(4) (emphasis added).  As courts have interpreted, "similar audio visual materials" broadly means any medium or format, digital or physical, that contains video content. *In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) ("Congress's use of the phrase 'similar audiovisual materials' indicates that the definition is medium neutral; the defendant must be in the business of delivering content, but that content need not be in a particular format."); *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012); *id.* at *6 ("To this reader, a plain reading of a statute that covers videotapes and 'similar audio visual materials' is about the video content, not about how that content was delivered (*e.g.* via the Internet or a bricks-and-mortar store)."); *see also In re Facebook, Inc., Consumer Privacy User Profile Litigation*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019) (finding allegations sufficiently pled that Facebook was a video tape service provider by "'regularly deliver[ing]' video content to users and maintain[ing] a cache of videos and visual materials"). The presence of video content, not the type of video content, is the VPPA's touchstone, an interpretation reinforced by the Senate Report, which lists "laser discs, open-reel movies, or CDI technologies" as examples.  S. Rep. 100-599, at 12.[1]  The Senate Report also establishes that

---

[1] By contrast, around the same time Congress passed the VPPA, twelve states passed their own VPPA state analog statutes, half of which were limited to "videotapes," and the half other of which used a more expansive approach to encompass "similar audio visual materials."  *Compare, e.g.*, Conn. Gen.

Congress well-understood that, by taking such a content-neutral approach, the VPPA would apply to "golf videos" the same as it would "Star Trek videos." *Id.* at 14.

Defendant's contrary interpretation is unconvincing.  According to Defendant, "a business is only a video tape service provider to the extent that it places the sale, rental or delivery of the same traditional content that was available at the video store at the center of a transaction, not merely because it delivers any video."  MTD at 10 (internal emphasis removed). In essence, Defendant asks this Court to hypothetically construct a 1980s-era video store, peruse the genres, and see if the videos at issue fit the "traditional content that was available at the video store." *Id.*  To support this approach, Defendant places the entire weight of its analysis on the word "similar," defining that term to mean "'nearly corresponding; resembling in many respects; somewhat like; having a general likeness.'" *Id.* at 8 (quoting *Similar*, Black's Law Dictionary (6th ed. 1990)).  Defendant contends that, by using the word "similar," Congress "did not intend the VPPA to apply to all audio-visual materials, only those like the videos rented by Judge Bork." *Id.*

That argument, however, contradicts the statutory text.  The VPPA expressly mentions "prerecorded video cassette tapes," yet there is no textual limitation on the content those tapes must contain.  *See* 18 U.S.C. § 2710(a)(4).  Whether they contain video clips or full-length movies, "prerecorded video cassette tapes" remain regulated materials.  If there is no content-based limitation on prerecorded video cassette tapes, then there is no content-based limitation on "audio visual materials" that are "similar" to that technology.  This view aligns with how courts

---

Stat. Ann. § 53-450, Del. Code. Ann. Tit. 11, § 925, La. Rev. Stat. Ann. § 37:1748, Md. Code Ann. Crim. Law § 3-907, N.H. Rev. Stat Ann. § 351-A:1, Tenn. Code Ann. § 47-18-2204 (limiting to "videotapes"), *with* Iowa Code Ann. § 727.11, Mass. Gen. Laws Ann. Ch. 93, § 106, Mich. Comp. Laws § 445.1711, Minn. Stat. Ann. § 325I.02, N.Y. Gen. Bus. Law § 672, R.I. Gen. Laws Ann. § 11-18-32 (broadly encompassing other audio visual materials).

have interpreted the VPPA's text and legislative history.  *See In re Vizio, Inc.*, 238 F. Supp. 3d at 1221 ("Congress's use of a disjunctive list (*i.e.*, 'engaged in the business … of … rental, sale, *or* delivery') unmistakably indicates that Congress intended to cover more than just the local video rental store."); *In re Hulu*, 2012 WL 3282960, at *6 (finding that Congress used the term "similar audio visual materials" so that the VPPA's protections "would retain their force even as technologies evolved").

Defendant's case authority says no differently.  Defendant analogizes to *United States v. Stanko*, but that case stands for the unremarkable proposition that "'qualifying words or clauses refer to the next preceding antecedent except when evident sense and meaning require a different construction.'"  491 F.3d 408, 414 (8th Cir. 2007).  Defendant and Plaintiff both agree that "similar audio visual materials" refers back to "prerecorded video cassette tapes," but the interpretations differ with respect to *how*, not *whether*, those qualifying words modify the antecedent.  Defendant also relies on *In re Hulu*, arguing that the court "made clear that the video content still needed to be akin to the type of movies viewed by Judge Bork."  MTD at 12.  *In re Hulu* said no such thing, and rather than support Defendant's position, *In re Hulu* undermines it, describing the actionable "video content" at issue as "includ[ing] *news*, entertainment, educational, and general interest programs."  2012 WL 328290, at *2 (emphasis added); *see id.* at *6 (recognizing that "the Senate Report confirms that Congress was concerning with protecting the confidentiality of private information about viewing preferences regardless of the business model or media format involved"); *see also* FAC ¶ 8 (alleging Defendant describes itself as providing "news, entertainment, and commentary across multiple brands and platforms") (internal quotations omitted).

Defendant's appeal to other privacy laws is likewise unpersuasive.  Defendant asserts that

the Cable Act governs "live television," which was historically "the primary means by which people consumed video news," so the VPPA would "supplant the Cable Act's coverage" if interpreted to cover that content.  MTD at 10.  But the Cable Act only applies to the "cable system," and only when a "cable operator" uses that system "to collect personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber concerned."  47 U.S.C. § 551(b)(C).  Here, Defendant is not a "cable operator," nor is Defendant's website used through "the cable system," so although Defendant does collect and disclose subscribers' personally identifiable information, there is no risk that applying the VPPA to Defendant's video clips would supplant the Cable Act's coverage.

Defendant relatedly argues that "[t]here is no evidence that in enacting the VPPA, Congress intended to … subject cable providers to both laws."  MTD at 10; *see also id.* at 11 (stating this is reaffirmed by "passage of the Satellite Home Viewer Extension and Reauthorization Act") ("SHVERA").  Defendant ignores the VPPA's text and legislative history which confirm that Congress sought to apply the VPPA to any entity—whether a cable provider, "department store," or "golf shop,"—that "engaged in the business" of selling, renting, or delivering the covered materials—" prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4); S. Rep. 100-599, at 13.  If a cable provider, like Comcast, acquired a video tape service provider, like Netflix, that combined entity must comply with both the VPPA and the Cable Act, depending on the service being provided.  This perfectly reflects the statutory scheme that Congress intended to enact.

Along with failing to comport with the VPPA's text and legislative history, Defendant's interpretation should be avoided because it raises serious constitutional concerns by implicating the First Amendment.  *See Jennings v. Rodriguez*, 138 S.Ct. 830, 842 (2018) ("When

'a serious doubt' is raised about the constitutionality of an act of Congress, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."(internal quotations omitted)).

A statute infringes the First Amendment if it "restrict[s] expression because of its message, its idea, its subject matter, or its content." *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1975).  Outside of a few well-defined categories of speech, "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (internal quotations omitted).  As the Supreme Court has held in analogous circumstances, a law is presumptively unconstitutional if it applies to content distributors, like Defendant, and if it establishes a "disincentive only on speech of a particular content." *See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

Defendant repeatedly and transparently interprets the VPPA as applying content-based distinctions, stating that an entity only constitutes a video tape service provider when selling, renting, or delivering "the same traditional content that was available at the video store."  MTD at 10; *see e.g.*, *id.* (stating the legislative history "reveals Congress' intent to limit the VPPA's scope to those who rent or sell videos like the ones Judge Bork would have rented, and not news clips"); *id.* at 3 (arguing the VPPA "does not cover news, whether delivered in black and white paper form, video clips, or podcasts"); *id.* at 2 (distinguishing its interpretation from "an extension to cover new methods").  Using Defendant's interpretation, the VPPA's application— and the corresponding need for a person or entity to comply with that statute—hinges on whether

a video's subject-matter is "akin to the type of movies viewed by Judge Bork."  MTD at 12; *see also id.* (arguing that the VPPA only applies to videos with subject-matters "similar to works that would have been distributed on prerecorded video cassette tapes").  That proposed regulation, as in *Simon & Schuster*, disincentives speech only of particular content, rendering the VPPA "presumptively inconsistent with the First Amendment," and triggering a strict scrutiny analysis.  *See Simon & Schuster, Inc.*, 502 U.S. at 115.  Accordingly, that construction must be avoided, and the better interpretation—the one the statute expressly contemplates—should be adopted: If the material contains video content, no matter that content's topic or subject-matter, then it constitutes "similar audio visual materials."

### B.   Defendant is Engaged in the Business of Delivering the Video Clips

Defendant contends that it cannot be "engaged in the business" of delivering video clips because "a fraction of the articles on bostonglobe.com are accompanied by a video," and that "does not transform the Globe from a news organization into a business significantly tailored to providing video content."  MTD at 13 (internal quotations omitted).  That argument misquotes the caselaw, misapprehends the statutory text, and mischaracterizes Plaintiff's allegations.

The term "'business' connotes 'a particular field of endeavor,' *i.e.*, a focus of the defendant's work."  *In re Vizio, Inc.*, 238 F. Supp. 3d at 1221.  "[F]or the defendant to be engaged in the business of delivering video content, the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose."  *Id.*  If an entity "'regularly delivers' video content to users and maintains a cache of videos and visual materials," then it is "plausible to conclude" that the entity "engages in the business of delivering audio visual materials, and that its business is 'significantly tailored to serve that purpose.'"  *In re Facebook, Inc.*, 402 F. Supp. 3d at 799.

*In re Vizio* is instructive.  There, the court correctly articulated what "engaged in the business" truly tries to limit:

> Take, for instance, a letter carrier who physically places a package that happens to contain a videotape into a consumer's mailbox.  No person is more obviously "delivering" a video tape to a consumer than this employee.  Yet, the letter carrier could not be characterized as "engaged *in the business*" of delivering video content because her job responsibilities are in no way tailored to delivering packages that contain videotapes as opposed to any other package.  In the same way, the developers of many other products or services that might be peripherally or passively involved in video content delivery do not fall within the statutory definitions of a video tape service provider.

*In re Vizio*, *Inc.*, 238 F. Supp. 3d at 1221-22.

As the FAC demonstrates, Defendant is no letter carrier.  Defendant's website "feature[es] 'national and local content daily,'" which includes "'news articles, photographs, images, illustrations, audio clips and video clip.'"  FAC ¶ 9 (quoting Defendant's Terms of Service).  Plaintiff alleges that "Defendant creates, hosts, and disseminates hundreds, if not thousands, of videos."  *Id.* ¶ 10.  "Defendant creates and hosts these videos so it can increase revenues through advertisements and subscriptions."  *Id.* ¶ 13.  Plaintiff alleges three types of subscriptions: "print only; digital only; and digital plus print."  *Id.* ¶ 14.  "A print-only subscriber cannot access Defendant's audio and video clips; only a digital subscriber can do that."  *Id.* ¶ 16.  "Defendant creates this exclusively digital content in an effort to increase the number of subscriptions."  *Id.* ¶ 17.  These allegations plainly support the inference that Defendant "'regularly delivers' video content to users and maintains a cache of videos and visual materials … for their delivery to users."  *See In re Facebook, Inc.*, 402 F. Supp. 3d at 799.  Delivering these videos, therefore, is necessarily "a focus of the defendant's work."  *See In re Vizio*, *Inc.*, 238 F. Supp. 3d at 1221.  At the pleading stage, those allegations establish beyond doubt that the Defendant's website is "substantially involved in the conveyance of video content to consumers"

and "significantly tailored to serve that purpose." *See id*.

Defendant's refutations are unpersuasive. As an initial matter, Defendant gets the law wrong. Defendant begins by misquoting *In re Vizio*. *Compare* MTD at 13-14 (quoting *In re Vizio* as defining "business" as "*the* focus of the defendant's work" (emphasis added)) *with In re Vizio,* 238 F. Supp. 3d at 1221 (defining "business" as "'a particular field of endeavor,' *i.e.*, *a* focus of the defendant's work" (emphasis added)). Had Congress sought to create a more stringent standard—"the focus" as opposed to "a focus"—it would have modified "engaged in the business" with words like "primarily" or "principally," precisely as it has done with other statutes. *See* 29 U.S.C. § 213(b)(10)(B) (exempting salesmen who are employed "by a nonmanufacturing *primarily engaged in the business* of selling trailers, boats, or aircrafts to ultimate purchasers" (emphasis added)); 20 U.S.C. § 1687(3)(A)(ii) defining "program" as corporate entities that "*principally engaged in the business* of providing education, health care, housing, social services, or parks and recreation"). Instead, Congress intended the statute to cover a variety of entities, ranging from "department store[s]" to "golf shop[s]" to "continuity club[s]." *See* S. Rep. 100-599, at 12-13.

Defendant then orchestrates a parade of horribles, warning about the dire consequences of the VPPA "extend[ing] to websites like the bostonglobe.com," foreseeing a world in which the VPPA applies to "apartment websites offering tours," perhaps even covering "travel organizations showing videos of travel destinations." MTD at 13. That same argument was rightly rejected in *In re Vizio, Inc.*, 238 F. Supp. 3d at 1222. There, defendants "argu[ed] that if Vizio is considered a video tape service provider, 'countless products and services[]' … would also fall within the statutory definition of video tape service providers." *See id.* (internal brackets omitted). As the court reasoned, however, to be a video tape service provider, an entity

11

must engage in "'the business' of delivering video content," and there are "[o]ther textual limitations that further cabin the scope of the Act," like its applicability only to "consumers," and how liability only extends to those that "release[] personally identifiable information without the consent of the consumer." *Id.* Here, as in *In re Vizio*, Defendant's "policy-laden argument cannot overcome the statute's plain meaning." *Id.*

Defendant ends its analysis by analogizing to *Lainer v. City of Boston*, 95 F. Supp. 2d 17 (D. Mass. 2000), but that case offers no reprieve. That case concerned Massachusetts' ticket-scalping law, which regulated any person who "engage[d] in the business of reselling any ticket or tickets for admission … without being licensed therefore by the commissioner of safety." *See id.* at 18-19 (quoting Mass. Gen. Laws. Ch. 140, § 185A (1924)). The plaintiff "had two tickets for $18 grandstand seats," and after his friend failed to show, the plaintiff "was approached by a buyer, [and] he offered the ticket for its face value." *Id.* at 18, 22. The court interpreted "engage[d] in the business" to mean that "the circumstances of the sale suggest that the defendant was doing business." *Id.* at 19. A single ticket resold at face value, the court held, did not meet this threshold. *Id.* at 21. But far from reselling a single ticket at face value, Defendant delivers "hundreds, if not thousands of videos" so that it can "increase revenues through advertisements and subscriptions." FAC ¶ 10, 13. By any measure, Defendant "was doing business" when delivering the video clips. *See Lainer*, 95 F. Supp. 2d at 19.

## II.   DEFENDANT DISCLOSED PLAINTIFF'S PERSONALLY IDENTIFIABLE INFORMATION TO FACEBOOK

Defendant asserts that Plaintiff's allegations fail because they "do[] not plausibly allege the Globe disclosed his identity to a third party." MTD at 14. That assertion ignores the voluminous caselaw holding otherwise.

The VPPA defines "personally identifiable information" as "information which identifies

a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  The First Circuit interprets that definition to mean "information reasonably and foreseeably likely to reveal which … videos [the plaintiff] has obtained."  *Yershov*, 820 F.3d at 486.  A Facebook ID is "equivalent to a name—it stands in for a specific person, unlike a device identifier."  *Robinson v. Disney Online,* 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2016); *see also Ellis v. Cartoon Network, Inc.*, 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) ("[D]isclosure of a Facebook ID, which can identify a specific person without any additional steps, does qualify as personally identifiable information."); *In re Nickelodeon Consumer Priv. Litig.*, 2014 WL 3012873, at *12 (D.N.J. July 2, 2014) ("Simply put, in a socially networked world, a Facebook ID is at least arguably 'akin' to an actual name that serves without more to identify an actual person."); *In re Hulu Priv. Litig.*, 2014 1724344 (N.D. Cal. Apr. 28, 2014) ("The Facebook User ID is more than a unique, anonymous identifier.  It personally identifies a Facebook user.").  Moreover, "[e]mail addresses fall within the ordinary meaning of information that identifies an individual."  *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) ("A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual."); *Shurtleff v. United States Environmental Protection Agency*, 991 F. Supp. 1, 19 (D.C.D.C. 2013) (using "email addresses" as an example of "personal identifying information"); *cf. Hidalgo-Semlek v. Hansa Medical, Inc.*, 498 F. Supp. 3d 236, 246 (D.N.H. 2020) ("The data contained organ transplant I.D.s, but was otherwise de-identified; that is, it did not include the patients' names, addresses, email addresses, telephone numbers, or IP addresses.").

Plaintiff alleges that "Defendant discloses subscribers' PII to Facebook."  FAC ¶ 20.  "At

13

a minimum, Defendant does this through the Facebook Tracking Pixel." *Id.*  Defendant discloses event data that "permit an ordinary person to identify what video an individual has watched." *Id.* ¶ 32.  Defendant additionally "transmit[s] the c_user cookie to Facebook," which contains "an unencrypted Facebook ID." *Id.* ¶ 33.  "Defendant also uses 'Advanced Matching,'" which, in part, "collect[s] and transmit[s] a subscriber's email address, first name, last name, telephone number, and mailing address." *Id.* ¶¶ 44, 47.  "This enables Facebook to then match those identifiers with that subscriber's subsequent activity on the site." *Id.* at ¶ 50.  By disclosing these identifiers with the event data, Defendant "knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior." *Id.* ¶¶ 52-55.

Defendant's attempted counters fall flat.  Defendant first asserts that "the code snippets don't actually show information entered into the form fields going to Facebook in any readable form."  MTD at 15.  Defendant contrasts this with other parts of the FAC, which "show data going to Facebook." *Id.* at 16.  Defendant sidesteps the allegations concerning the "customized parameters," which show that, when a user clicks "Complete My Purchase" or "Continue," Defendant transmits "formFeatures," including inputs for the "email," "address1," "zip," and "phone" boxes.  FAC ¶¶ 47-51.  As for the Automatic Advanced Matching, Defendant declines to address the "selectedMatchKeys," which shows that Defendant has configured its Pixels to scan for "en," "fn," and "ln." *Id.* ¶ 46.  As the cited Facebook documentation explains, those abbreviations stand for email, first name, and last name. *Id.* ¶ 46, n. 43.  At the pleading stage, that is enough to support the allegation that "Defendant's Pixels are configured to scan form fields containing user's email address, first name, and last name." *Id.*

Defendant then argues that, even if it discloses a subscriber's email address, that

identifier is "hashed … and is therefore insufficient to sustain a claim."[2]  *See* MTD at 16.

Defendant leaves this argument unmoored from authority, presumably because the relevant

caselaw conclusively states the inverse.  *See, e.g.*, *Robinson*, 152 F. Supp. 3d at 182–83 ("Disney

could not disclose the information at issue here, along with a code that enabled Adobe to decrypt

the hashed serial number and other information necessary to determine the specific device's user,

and still evade liability."); *In re Hulu*, 2014 WL 1724344, at *11 ("One could not skirt liability

under the VPPA, for example, by disclosing a unique identifier and a correlated look-up table.");

*see also Perry v. Cable News Network, Inc.*, 2016 WL 4373708, at *4, n. 7 (N.D. Ga. Apr. 20,

2016) ("[T]he *Hulu* court recognized an important distinction: had Defendants disclosed the

unique identifier along with some sort of correlating look-up table, a violation might be

present.").

Defendant finally argues that "information collected from the user by Facebook via the

c_user cookie is not information disclosed by Facebook."[3]  MTD at 17 (emphasis removed).  To

support this argument, Defendant analogizes to the federal Wiretap Act, citing *In re Google Inc.*

*Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125, 145 (3d Cir. 2015) ("*In re*

*Google Cookie*").  As the Third Circuit itself has impliedly recognized, the Wiretap Act has no

relevance to what constitutes a disclosure under the VPPA.  *See In re Nickelodeon Cons. Priv.*

*Litig.*, 827 F.3d 262, 278 (3rd Cir. 2016) (finding that, as to the wiretapping claims, "our

---

[2] To "hash" information means to assign "a numeric or alphanumeric string to a piece of data via the application of a function whose output values are all the same number of bits in length." Oxford English Dictionary, Third Edition, March 2001; online version June 2022 at https://www.oed.com/view/Entry/75976481#eid12511366.

[3] Defendant presents this argument after unironically quoting *In re Hulu* for its legal standard, despite that case squarely involving the c_user cookie.  *See In re Hulu*, 86 F. Supp. 3d 1090, 1093 (N.D. Cal. 2015) ("[F]rom April 2010 until June 7, 2012, when the Like button loaded, it would prompt the user's browser to send Facebook both the user's numeric Facebook ID (from the c_user cookie) and the title of the video that the user was watching (contained in the Hulu watch-page address).").

spadework in *Google* goes a long way towards resolving this case," but that "[t]he plaintiffs

bring two claims—one for violation of the Video Privacy Protection Act, and one for intrusion

upon seclusion under New Jersey law—that require us to break new ground").  Even if the

Wiretap Act has a semblance of relevance, the First Circuit expressly disagrees with Defendant's

position and *In re Google Cookie*.  *In re Pharmatrak, Inc.*, 329 F.3d 9 (1st Cir. 2003) (rejecting

the argument "'that there was no interception because 'there were always two separate

communications: one between the Web user and the Pharmaceutical Client, and the other

between the Web user and Pharmatrak.'"); *see also In re Facebook, Inc. Internet Tracking

Litigation*, 956 F.3d 589, 608 (9th Cir. 2020) (holding that "[w]e adopt the First and Seventh

Circuits' understanding that simultaneous, unknown duplication and communication of GET

requests do not exempt a defendant from liability under the party exception"); *United States v.

Szymuskieicz*, 622 F.3d 701, 703, 706 (7th Cir. 2010).

        Moreover, Defendant's interpretation—asking the Court to essentially carve out cookie

data from the VPPA's reach—belies the plain meaning of "disclose." *Compare* Oxford English

Dictionary, Third Edition, March 2001; online version June 2022 at https://www.oed.com/

view/Entry/53775?rskey=bE4VeM&result=3&isAdvanced=false#eid ("To uncover and expose

to view (anytime material)") *with* FAC ¶ 68 (alleging Defendant "surreptitiously collected and

transmitted [Plaintiff's] personally identifiable information").    That interpretation also upends

the legislative intent.  S. Rep. 100-599, at 5-6 (expressly contemplating "interactive television

cables, the growth of computer checking and check-out counters, of security systems and

telephones, all lodged together in computers"); *Id.* at 8 (seeking to confer onto consumers the

power to "maintain control over personal information divulged and generated in exchange for

receiving services from video tape service providers"); *In re Hulu*, 2012 WL 3282960, at *6

("Given Congress's concern with protecting consumers' privacy in an evolving technological world, the court rejects the argument.").   Finally, to the extent there is any ambiguity, the term "disclose" should be interpreted broadly.  *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984) ("'When technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose.'" (quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975)).

## III.   DEFENDANT DISCLOSED PLAINTIFF'S PERSONALLY IDENTIFIABLE INFORMATION KNOWINGLY

Defendant contends that Plaintiff only makes "the conclusory allegation that the Globe knowingly discloses subscribers' PII to Facebook."  MTD at 19 (internal brackets and quotations omitted).  That assertion ignores the 89 paragraphs in the FAC that unmistakably demonstrate that Defendant knew it was disclosing Plaintiff's PII to third parties.

A defendant discloses PII knowingly when it possesses "consciousness of transmitting the private information."  *In re Hulu*, 86 F. Supp. 3d at 1095.  This approach is "consistent with cases that have explained the knowledge requirement under the Electronic Communications Privacy Act of 1986, on which the VPPA was modeled."  *Id.*  It does not matter whether the defendant possesses "knowledge of illegality or potential consequences," *see Senne v. Village of Paletine, Ill.*, 695 F. 3d 597, 603 (7th Cir. 2012), nor does it matter whether "third parties actually see the disclosed information to constitute a violation."  *Easlin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 671 (E.D. Pa. 2015); *see also In re Hulu Priv. Litig.*, 2013 WL 6773794, at *7 (N.D. Cal. Dec. 20, 2013) ("Again, the DPPA's plain language is so similar to the VPPA as to be practically indistinguishable.").

Plaintiff plausibly pled that Defendant disclosed his PII knowingly.  "Boston Globe knowingly disclosed Plaintiff's PII because it used that data to build audiences on Facebook and

retarget them for their advertising campaigns." FAC ¶ 86. To build the audiences, Defendant "integrate[d]" and "activated" the Facebook Tracking Pixel. *Id.* ¶ 25. Defendant, like all other advertisers, "control[led] how the Facebook Tracking Pixel identifie[d] visitors." *Id.* ¶ 27. Defendant also controlled the event data collected, "including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks." *Id.* ¶ 26. These allegations fully support the notion that Defendant "knowingly disclos[ed] its subscribers' personally identifiable information—including a record of every video clip they view—to Facebook without consent." *Id.* ¶ 2. Thus, by integrating and configuring the Facebook Tracking Pixel, Defendant possessed "consciousness of transmitting the private information." *See In re Hulu*, 86 F. Supp. 3d at 1095.

Far from a "fail[ing] to plead a 'knowing' disclosure of PII," *see* MTD at 20, Plaintiff exhaustively supports his claims with factual allegations. *See, e.g.*, FAC ¶¶ 23-24 (describing how advertisers, like Defendant, integrate the Facebook Tracking Pixel so they can build "Custom Audiences" and "Lookalike Audiences," both of which "require an advertiser to supply the underlying data to Facebook"); *Id.* ¶¶ 26, 28 (explaining how "[a]dvertisers control what actions—or, as Facebook calls it, 'events'—the Facebook Tracking Pixel will collect," and how Defendant "transmits five distinct events to Facebook"); *Id.* ¶¶ 26, 28 (stating that advertisers, like Defendant, can choose from "a menu of 'standard event,'" and showing that Defendant selected "PageView," "PixelInitialized," and "ViewContent"); *Id.* ¶¶ 26, 31, 47 (describing how "[a]n advertiser can also create their own tracking parameters by building a 'custom event,'" and revealing that Defendant transmits "custom parameters" through "Button Click"); *Id.* ¶¶ 17, 84 (showing the "off-site activity report," which confirms that "Boston utilized the Facebook Tracking Pixel to compel Plaintiff's web browser to transfer Plaintiff's identifying information,

18

like his Facebook ID, along with Plaintiff's event data, like the title of the videos he watched and what buttons he pressed when doing so").

Notwithstanding this, should any skepticism remain, courts relax the pleading requirements "where information is in a defendant's sole possession." *McCorhan v. Sandulli Grace, P.C.*, 369 F. Supp. 3d 324, 335 (D. Mass. 2019) (internal quotations omitted). This is particularly true with regard to allegations concerning "knowledge," which "may be alleged generally." Fed. R. Civ. P. 9(b). At a minimum, therefore, Plaintiff's allegations are sufficient to move beyond the pleading stage and into discovery.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion should be denied in full.

Dated: July 19, 2022                         Respectfully submitted,

                                                      */s/ David S. Godkin*
                                                      David S. Godkin (BBO#196530)
                                                      James E. Kruzer (BBO#670827)
                                                      **BIRNBAUM & GODKIN, LLP**
                                                      1 Marina Park Drive, Suite 1410
                                                      Boston, MA 02210
                                                      (617) 307-6100
                                                      godkin@birnbaumgodkin.com
                                                      kruzer@birbnaumgodkin.com

                                                      **BURSOR & FISHER, P.A.**
                                                      Joshua D. Arisohn
                                                      Philip L. Fraietta
                                                      888 Seventh Avenue
                                                      New York, NY 10019
                                                      Telephone: (646) 837-7150
                                                      Fascimile: (212) 989-9163
                                                      E-Mail: jarisohn@bursor.com
                                                                  pfraietta@bursor.com

                                                      **BURSOR & FISHER, P.A.**
                                                      Christopher R. Reilly

701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
E-Mail: creilly@bursor.com

***Attorneys for Plaintiff and the Putative Classes***