# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID AMBROSE, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br> v.<br><br>BOSTON GLOBE MEDIA PARTNERS, LLC,<br><br>      Defendant. | Civil Action No. 1:22-cv-10195-RGS<br><br>Hon. Richard G. Stearns |

## DECLARATION OF PHILIP L. FRAIETTA IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, COSTS, EXPENSES, AND INCENTIVE AWARD

I, Philip L. Fraietta, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

  1. I am a partner at Bursor & Fisher, P.A., and I am Class Counsel in this action. I am an attorney at law licensed to practice in the States of New York, New Jersey, Illinois, and Michigan, and I am admitted in this action *pro hac vice*. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

  2. I make this declaration in support of Plaintiff's Motion for Attorneys' Fees, Costs, Expenses, and Incentive Award, filed herewith.

  3. Attached hereto as **Exhibit 1** is a true and correct copy of the Parties' Class Action Settlement Agreement (the "Settlement"), and the exhibits attached thereto.

  4. Beginning in June 2021, Class Counsel commenced an extensive pre-suit investigation, which included identifying the Facebook Tracking Pixel and developing a methodology to test for the Pixel's use on various websites. That process was technical and required substantial labor and technological knowledge.

5.      Following that investigation, on February 5, 2022, Plaintiff David Ambrose filed a putative class action on behalf of digital subscribers to the *Boston Globe* who have a Facebook account and viewed videos on Defendant's website pursuant to the Video Privacy Protection Act, 18 U.S.C. § 2710, *et. seq.* (the "VPPA").  ECF No. 1.  To my knowledge, this was the first ever Facebook Tracking Pixel-based VPPA case filed across the country, thus pioneering the field.  Indeed, since that time, dozens of Facebook Tracking Pixel-based VPPA cases have been filed across the country.

6.      On April 29, 2022, in response to the Complaint, Defendant filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  ECF No. 12.

7.      On May 20, 2022, Plaintiff filed the operative First Amended Complaint (the "FAC") pursuant to Fed. R. Civ. P. 15(a)(1)(B) to address the purported deficiencies in the original Complaint.  ECF No. 22.

8.      On June 21, 2022, Defendant filed a motion to dismiss Plaintiff's FAC, which was accompanied by a 20-page memorandum of law.  ECF No. 25.

9.      On July 19, 2022, Plaintiff filed his opposition to Defendant's motion to dismiss, which comprised of a 19-page memorandum of law.  ECF No. 28.

10.     On August 17, 2022, Defendant filed its reply memorandum of law in support of its motion to dismiss.  ECF No. 29.

11.     The issues briefed in the motion to dismiss were novel.  Indeed, at the time, no court had ever addressed a motion to dismiss a Facebook Tracking Pixel-based VPPA case.

12.     On September 19, 2022, the Court issued a Memorandum and Order denying Defendant's motion to dismiss in its entirety.  ECF No. 31.

13.     On October 12, 2022, Defendant answered the FAC by denying the allegations

generally and raising nine affirmative defenses. ECF No. 36.

14. Thereafter, the Parties engaged in written and document discovery, which included meet-and-confer conferences, and exchanged initial disclosures pursuant to Fed. R. Civ. P. 26.

15. My firm also engaged a consulting expert who assisted us in preparing discovery and tailoring our theory of the case.

16. Mindful that, as with any litigation, there is significant risk to both sides, from the outset of the case, the Parties engaged in direct communications, and as part of their obligations under Fed. R. Civ. P. 26, discussed the prospect of resolution.

17. Those discussions led to an agreement between the Parties to engage in mediation, which the Parties agreed would take place before The Honorable Frank Maas (Ret.) – formerly of the Southern District of New York and now a mediator at JAMS (New York).

18. The Parties stipulated to stay the case pending the mediation and the Court granted that stipulation on January 18, 2023. ECF No. 39.

19. As part of the mediation, the Parties exchanged informal discovery, including on issues such as the size of the potential class. The parties also exchanged detailed mediation statements, airing their respective legal arguments and theories on potential damages.

20. Given that this information was the same or largely similar to discovery that would be produced in formal discovery related to class certification and summary judgment, the Parties were able to sufficiently assess the strengths and weaknesses of their cases.

21. The mediation took place on February 8, 2023. While the Parties engaged in good faith negotiations, which at all times were at arms' length, they failed to reach an agreement that day. However, because the Parties felt they had made progress, they stipulated to

extend the stay to continue their mediation efforts, which the Court granted. ECF Nos. 41, 43, 45.

22. Over the next several weeks, the Parties engaged in additional rounds of arms' length negotiations facilitated by Judge Maas, and, on March 31, 2023, reached agreement on all material terms of a class action settlement and executed a term sheet. ECF No. 46.

23. In the weeks following, my firm negotiated and finalized the full-form Settlement Agreement, which is attached to this Declaration as Exhibit 1, selected a Settlement Administrator after a competitive bidding process, and prepared a motion for preliminary approval.

24. On May 25, 2023, the Court issued an Order Granting Preliminary Approval. ECF No. 52.

25. Since that time, my firm has worked with the Settlement Administrator, Epiq, to effectuate the court-ordered Notice, and has fielded calls from Settlement Class Members answering their questions and assisting them in filing claims.

26. Since class notice has been disseminated, my firm has also worked with Epiq on a weekly basis to monitor settlement claims and any other issues that may arise.

27. The resulting Settlement secures an excellent recovery for the Settlement Class. Pursuant to the Settlement, Defendant will establish a non-reversionary cash Settlement Fund in the amount of $4,000,000. Settlement ¶ 1.32. Settlement Class Members will be entitled to submit claims against the Settlement Fund. *Id.* ¶ 2.1. All Settlement Class Members who submit a valid claim will be entitled to a *pro rata* portion of the Settlement Fund after payment of Settlement Administration Expenses, attorneys' fees and costs, and any incentive award, if approved by the Court. *Id.* Class Counsel estimates that each claiming Settlement Class

Member will receive a net payment of $20-$40.

28. In addition to the monetary relief described above, Defendant will also provide up to $1,000,000 of In Kind Relief, in the form of an extension of any existing digital subscription to the *Boston Globe* of whatever type enjoyed by the claiming Settlement Class Member for a maximum of 7 days past its current expiration date for no additional payment. *Id.* ¶ 1.16. Settlement Class Members will have the ability to select In Kind Relief in addition to a monetary payment, or as a stand-alone remedy. *Id.* ¶ 2.1(b).

29. As part of the Settlement, within 45 days of the Preliminary Approval Order, Defendant will also agree to suspend operation of the Facebook Tracking Pixel on any pages on its website that both include video content and have a URL that substantially identifies the video content viewed, unless and until the VPPA is amended, repealed, or otherwise invalidated (including by judicial decision on the use of website pixel technology by the United States Supreme Court, any federal court of appeals, a U.S. federal district court in Massachusetts, or a Massachusetts state court of general jurisdiction), or until Defendant obtains VPPA-compliant consent for the disclosure of the video content viewed to Facebook. *Id.* ¶ 2.2.

30. Based on Defendant's records there were approximately 522,145 *Boston Globe* subscribers[1] who visited Defendant's website during the class period, although not every subscriber is necessarily a Settlement Class Member (for example, a subscriber may not have had a Facebook account or may not have watched videos on Defendant's website). Still, even if a small percentage of those subscribers are Settlement Class Members the Settlement Class

---

[1] At preliminary approval, the Parties estimated that there were approximately 485,000 subscribers, but further confirmatory discovery confirmed 522,145 was the more precise measure. Due to these additional subscribers, Class Counsel has revised its estimate of per-claimant recovery from $22-$44 to $20-$40. As will be detailed in the forthcoming final approval motion, all disseminated class notices provided the $20-$40 estimated per-claimant recovery range.

would still number in the thousands.

31. From the outset of the case, Plaintiff and Class Counsel recognized that the case presented substantial and novel litigation risks. As aforementioned, this was the first ever Facebook Tracking Pixel-based VPPA case to be filed across the country, and therefore the case necessarily presented novel and complex legal issues. For example, Defendant contends that: (i) it is not a "video tape service provider" within the meaning of the VPPA; (ii) the information it allegedly disclosed to Facebook does not constitute PII within the meaning of the VPPA; and (iii) any disclosures of PII to Facebook were not made by Defendant "knowingly," as required by the VPPA. An adverse decision on any of these contentions would deprive Plaintiff and the Settlement Class of any recovery whatsoever.

32. Indeed, other Facebook Tracking Pixel-based VPPA cases have failed at the motion to dismiss stage. *See, e.g.*, *Gardener v. MeTV*, 2023 WL 4365901, at *5 (N.D. Ill. July 6, 2023) (granting the motion to dismiss and "find[ing] dispositive MeTV's argument that Plaintiffs are not consumers under the Act"); *Carter v. Scripps Networks, LLC*, 2023 WL 3061858, at *6 (S.D.N.Y. Apr. 24, 2023) (granting motion to dismiss because "[t]he Complaint describes plaintiffs as subscribers of hgtv.com newsletters, but does not plausibly allege that they were subscribers of hgtv.com video services"); *Martin v. Meredith Corp.*, 2023 WL 2118074, at *3 (S.D.N.Y. Feb. 17, 2023) ("The plaintiff's VPPA claim is dismissed because the complaint itself shows that the defendants do not disclose information showing that a person has 'requested or obtained specific video materials or services.'"); *Hunthausen v. Spine Media, LLC*, 2023 WL 4307163, at *3 (S.D. Cal. June 21, 2023) (granting motion to dismiss because "[r]enting, purchasing or subscribing for goods or services from a third party connected to a [video tape service provider] is insufficient to make someone a 'consumer' under the VPPA"); *Cantu v.*

*Tapestry, Inc.*, 2023 WL 4440662, at *10 (S.D. Cal. July 10, 2023) ("[T]he Court finds Plaintiff has failed to state a claim on the basis that he has not properly alleged that Defendant is a 'video tape service provider.'"); *Carroll v. General Mills, Inc.*, 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023) (granting motion to dismiss because "[p]laintiffs do not allege any facts suggesting that the delivery of audiovisual material is General Mills' particular field of endeavor or that General Mills' products are specifically tailored to serve audiovisual material"). And while other Facebook Tracking Pixel-based VPPA cases have not reached class certification or summary judgment, similar Pixel and VPPA cases have failed at those stages of the litigation. *See, e.g.*, *Doe v. Medstar Health, Inc.*, 23-C-20-000591, Dkt. Nos. 70-71, at p. 1 (Md. Cir. Ct. 2023) (denying a motion for class certification in Pixel case); *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1097 (N.D. Cal. 2015) (denying a motion for summary judgment in VPPA Facebook cookie case because "there [was] no evidence that Hulu knew that Facebook might combine a Facebook user's identity (contained in the c_user cookie) with the watch-page address").

33. Despite the clear risks, my firm undertook this matter on a contingency basis with no guarantee of recovery and has committed substantial resources of attorney and staff time, in addition to out-of-pocket costs and expenses, towards investigating, litigating, and settling the matter. In doing so, my firm also assumed the risk of the significant delay associated with achieving a final resolution through trial or any appeals.

34. My firm, Bursor & Fisher, P.A., and I have significant experience in litigating class actions of similar size, scope, and complexity to the instant action. (*See* Firm Resume of Bursor & Fisher, P.A., a true and accurate copy of which is attached hereto as **Exhibit 2**). My firm and I regularly engage in major complex litigation involving consumer privacy, have the resources necessary to conduct litigation of this nature, and have frequently been appointed lead

class counsel by courts throughout the country. *See* Ex. 2; *see also Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. Feb. 25, 2014) ("Bursor & Fisher, P.A., are class action lawyers who have experience litigating consumer claims. … The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries in five class action jury trials since 2008.").

35. The Parties agreed to the terms of the Settlement through experienced counsel who possessed all the information necessary to evaluate the case, determine all the contours of the proposed class, and reach a fair and reasonable compromise after negotiating the terms of the Settlement at arm's length and with the assistance of a neutral mediator.

36. Plaintiff and Class Counsel recognize that despite our belief in the strength of Plaintiff's claims, and Plaintiff's and the Class's ability to ultimately each secure a $2,500 statutory award under the VPPA, the expense, duration, and complexity of protracted litigation would be substantial and the outcome uncertain.

37. Plaintiff and Class Counsel are also mindful that absent a settlement, the success of Defendant's various defenses in this case could deprive the Plaintiff and the Settlement Class Members of any potential relief whatsoever. Defendant is represented by highly experienced attorneys who have made clear that absent a settlement, they were prepared to continue their vigorous defense of this case. Plaintiff and Class Counsel are also aware that Defendant would continue to challenge liability, as well as assert a number of defenses. *See supra* ¶ 30. Plaintiff and Class Counsel are also aware that Defendant would oppose class certification vigorously, and that Defendant would prepare a competent defense at trial. Looking beyond trial, Plaintiff is also aware that Defendant could appeal the merits of any adverse decision, and that in light of the statutory damages in play, it would argue – in both the trial and appellate courts – that the award

of any statutory damages is not warranted or for a reduction of damages based on due process concerns. *See, e.g.*, *Rogers v. BNSF Railway Co.*, 2023 WL 4297654, at *13 (N.D. Ill. June 30, 2023) (vacating jury's statutory damages award in statutory privacy class action and ordering a new trial on damages); *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1125 (9th Cir. 2022) (vacating and remanding district court's denial of post-trial motion challenging the constitutionality of statutory damages award in statutory privacy class action and ordering the district court to reassess the question with new appellate guidance).

38. Plaintiff and Class Counsel believe that the relief provided by the Settlement weighs heavily in favor of a finding that the Settlement is fair, reasonable, and adequate, and well within the range of approval.

39. I am of the opinion that Mr. Ambrose's active involvement in this case was critical to its ultimate resolution. He took his role as class representative seriously, devoting significant amounts of time and effort to protecting the interests of the class. Without his willingness to assume the risks and responsibilities of serving as class representative, I do not believe such a strong result could have been achieved.

40. Mr. Ambrose equipped my firm with critical details regarding his experiences with Defendant. He assisted my firm in investigating his claims, detailing his digital subscription to the *Boston Globe*, how he registered for Facebook, and how he would watch videos on the *Boston Globe* website. Mr. Ambrose also assisted my firm by supplying supporting documentation, aiding in drafting the Complaint and the First Amended Complaint, and preparing to respond to written interrogatories, and produce documents in formal discovery. Mr. Ambrose was also prepared to testify at deposition and trial, if necessary. And he was actively consulted during the settlement process.

41. In short, Mr. Ambrose assisted my firm in pursuing this action on behalf of the Class, and his involvement in this case has been nothing short of essential.

I declare under penalty of perjury that the above and foregoing is true and accurate. Executed this 28th day of July 2023 at New York, New York.

                                                */s Philip L. Fraietta*
                                                  Philip L. Fraietta